Good morning Judge Jones, Chief Judge Stewart, and Judge Owens. Thank you for this opportunity. I am Victoria Plant Northington and I represent Otis Grant the appellant. May it please the court, before I address whether Mr. Grant produced enough evidence for jury to reasonably conclude that Harris County discriminated, harassed, and retaliated against him, I must quickly address the issue of the motion to amend because that bears on whether this court considers the retaliation claim under Title VII as well. If the panel agrees that there was error in not including or in denying the Title VII amendment based on a de novo review, then we can address the 88 and Title VII claims at the same time. I believe both sides will agree that the retaliation, discrimination, and harassment elements are the same under Title VII and the 88. I can address the motion to amend to add the claims now. Please focus on three key points. Case precedent first states that the district court fails to give a stated reason for the denial of a motion to amend. There is error and this court is required to reverse under a de novo review. That is Lowry v. Texas A&M University, Systems 117F3-242, 5th Circuit, 1994, as well as Malvo v. Healthcare Services and Indemnification Company, 376F3-420, 427, that's a 5th Circuit 2004 case. This panel can look at the order to see on the motion to amend that the court never gave any reason or justification for not granting the order. There was no surprise to the county. It appears the county now claims that there may have been a trial delay. Many things can delay a trial. Case law says that there must be more than a delay of trial for it to be sufficient to deny a motion to amend. That's Wedgworth v. You're talking about the fourth, what would have been the fourth amended complaint? Yes, Your Honor. All right. So there had been a third amended complaint, so the scenario when the proposed fourth was to be filed, as I understand it, that was after discovery had closed, right? That was after discovery had closed, however, there was a stay granted in this case based upon the county's request of a 90-day stay. So we had never requested a time or any additional time to conduct discovery. However, in our motion, we did say that we were open to additional discovery if necessary. All right. Well, you got 11 total minutes, and this case got a lot of stuff going in, so I don't know if you want to speak to that, but succinctly put, because it was the fourth amended complaint and our standard of review, the rule requires that good cause be shown, and so the determination below was that good cause was not shown. So just succinctly state so we're clear, what's the good cause you are asserting as a basis to amend a fourth time after discovery had closed? Yes, Your Honor. The reason we were asserting it is because we had a Title VII claim now. The Department of Justice, who issues right to sue letters for governmental entities, had not included the Title VII claim in their prior notices of rights to sue. So when I discovered that and realized that that was not included in the right to sue, only the ADA claim was included, I contacted the Department of Justice. They corrected their error. I brought that to the attention of the court in the motion to amend, and that shows good cause, or else we would have to file another lawsuit, and we actually did that to preserve any issue of waiver later on. So we believe that is good cause, plus we believe good cause is shown by this issue per the admission of the county's attorney was addressed during the depositions of Mr. Grant. The Title VII claim and his statement that he complained about Mr. Samuel discriminating against African employees based on their national origin was included. That has always been included in the pleadings. So it put them on notice, and there would be no prejudice. Moving on to the harassment claims. This case is like no other, I believe. Mr. Grant provides at least 22 incidents of harassment in his affidavit. While the court has never specifically stated a number that is required to constitute harassment, Mr. Grant believed that 22 incidents of harassment that are outlined in his affidavit are clearly sufficient to substantiate his claim of harassment based on discrimination and his harassment based upon retaliation. Mr. Grant believes that he has presented sufficient evidence for the court to look at the facts in the record to show that a reasonable jury can conclude that, based upon the reasons that were given by the county, the changing reasons that were given by the county on many occasions. First, he was accused of falsifying checklists or records from the department. Then it became, well, the electronic device was the issue. The electronic device wasn't the issue because Dr. Shelton, the director of HR, stated that had that been removed, they would have still terminated Mr. Grant. It had no bearing on his termination. You see that the county continues to add additional reasons, fraud, credibility issues, that he was lazy, that he didn't do his job properly. None of this information is supported by the record. Throughout the brief of the county, they continue to make assertions that are not true. And I think I bring that out in my reply brief, that many of their contentions have been fabricated or sensationalized and are not truthful. There is another issue, it brings up another issue, as it relates to the spoliation of documents in this case. There was an investigation done in February of 2012. That investigation was a part of the process of Mr. Grant filing a complaint in December of 11. Subsequently, he was given six write-ups in approximately maybe seven months. Six or seven months. He was out on the job injury for about four months in 2012. And so therefore, on average, he was given a write-up every month. We believe that that information shows the causal connection, the scheme. Not just close proximity in time, but a scheme and a pattern that this circuit has clearly recognized can form a causal connection at the prima facie case. Mr. Grant was denied an accommodation. He was initially given the accommodation without even requesting it back in 2009, 2008, 2009. What was his accommodation back then? They gave him sedentary positions. So he was able to work in inventory, to do intake, to do laundry, things that did not require him to walk or stand for long periods of time. That is a part of the big range of JSO duties. Did he ever complain that doing these checks on the inmates required him to walk unduly? Yes, he did complain numerous times. When he reported Mr. Samuel in August 2011, Mr. Samuel retaliated against him and revoked his accommodations. And so he was required to work in the most labor intensive ward or floor of the juvenile detention center. And that's 4A, and I believe that's outlined in the brief. It was isolated from all the others. He had to request and wait when he needs to take breaks because of his diabetic medication. At one, a few times, he almost urinated and defecated on himself because he was not permitted to go on a break because he had to wait until the mail units came back to help him. There was no reason to place Mr. Grant in 4A. The only reason Mr. Grant was placed in 4A was based on retaliation and discrimination. Well, now, the district court, I believe, found that he failed to establish a disability. And the district court apparently based that in part on some of his deposition testimony. I believe that the court was alluding to some testimony in a deposition that asked Mr. Grant whether he was able to perform his job on the day that caused the termination, which was October 23rd, I believe, 2013. On that day, he was working constant watch. Constant watch requires very little movement. He sits down and he watches an inmate to make sure that inmate is safe and sleep. So, of course, on that day, he could perform his duty because he was on a constant watch. Constant watch had also been a part of his duties prior to August 2011. I mean, my understanding is your client testified that he was able to fulfill all the essential functions of his duties, such as being able to stand or not stand between 2012 and 2013, that he testified to that? I don't believe that specifically states what he, his. I don't believe the record states that. I think the record states that the majority was not defined. Majority is 51%, as I stated in the brief. Mr., of course, no one is standing the entire shift. The JSOs, even if they're assigned to the floor to do the checklist, they have time where they sit. So, it is only, as it relates to the essential functions of the position that was listed, it was only required that he be able to stand and walk at least, I guess, 51%, if you consider majority to mean 51% of his shift. There was never a question regarding what majority was. But he was able to do so, and specifically on the 23rd, when he was on constant watch. And I think that's what that testimony in the deposition reference is on the day that he was terminated. Was he prepared to do his job? Initially, the county challenged the disability. Has that changed? Does the county now acknowledge that he had a disability and that's no longer in dispute? Yes, Judge, they have. I think my time is up. You still got a minute and 40, unless you're giving them away. I have a lot to accomplish. I just wanted to be clear in my mind of whether that was still an issue in dispute with the fact that it wasn't. Yes, that is no longer an issue of fact. And also, the court failed to, after it ruled, I think the issue, I don't know if this is an issue for this court that's material, but the response, not filing the response, seems to be the big issue in this case. The court on February 21st had a spoliation hearing where the court stated initially it was going to deny the summary judgment. The court came back and said, well, I'll take it under consideration and it specifically said, I believe Ms. Victoria Platt-Northington has not filed a response to it and I don't expect to receive a written response to it because I think this needs to be tried. That's in the record 18-2035, 2577. So the court sort of went back and forth. The court did say at some point, well, I do want you to file something. And I said, okay, what date? The court said March 1st. But the court also said during that time, I'm concerned about Mr. Grant's testimony. I need to go and review it before making my decision. The very next day, well, actually I was preparing the joint pretrial order because this was to go to trial in the next few weeks. I get a notice that the court has entered a judgment denying the motion for summary judgment. So in reliance on that, I believe a response is moot, so I do not file a response. The only thing that initiated something by the court is the county filed a motion for reconsideration of the court's ruling denying the summary judgment. And on that same day, the court withdrew its order and said that it found that there was no disability and that the Title VII claim was time barred. And it didn't allow the amendment, but it ruled on it. So it was sort of conflicting. Thank you. You've got a red light, but you've preserved your rebuttal time. So let's hear from Mr. Hopkins. All right, first up, Mr. Hopkins, clarify me. Is it correct to dispute at some point of whether or not he was disabled or not? Is that going away? Yes, Judge, we are no longer disputing that diabetes is technically a disability under the ADA amendments. We are disputing, excuse me, the effect of diabetes on his job, in other words, the permutations that it had on his ability to work, and we're disputing every other element of his claim. Okay. May it please the court, good morning. I'm Seth Hopkins representing Harris County. I'll address each of the six issues for review, starting with the district court's granting of summary judgment. This is an ADA case where plaintiff admits he told his employer he did not want an accommodation, declined to engage in a good faith interactive process, failed to show he was denied any specific reasonable accommodation, was already provided the easiest job available on the easiest shift, signed his job description under protest, and was ultimately terminated for serious workplace misconduct. Under any standard of review, summary judgment was proper. Summary judgment is typically reviewed de novo. In this case, however, Mr. Grant submitted no summary judgment evidence until after final judgment. When he moved to amend, based primarily on his misunderstanding of the court's instructions and the reputational injury caused to plaintiff's counsel by the dismissal of the case, the motion to amend barely addressed the merits of summary judgment and did not even include a proposed order. It did, however, include 771 pages and 40 exhibits of attachments that formed the basis of Mr. Grant's factual allegations on appeal. However, there is no evidence the trial court considered these attachments. Thus, before we even get to the question of Mr. Grant's evidence, we have to address whether the trial court properly denied the motion to amend. The closest analogy comes from the template case, where a party missed a summary judgment deadline response. Final judgment was entered 60 days later, and plaintiffs moved to amend by attaching their summary judgment evidence. They gave five reasons for missing their deadline, including their confusion over the scheduling order and the fact that their attorney abandoned them. This court affirmed the trial court's denial of the motion to amend and found no manifest injustice. So what was the, I mean, just kind of bullet pointy, what was the nature or quality of the summary judgment record that the court actually considered? because you're saying there were other matters later presented, right? I'm sorry, can you repeat the question? Well, just give me kind of a snapshot of what the quality of the summary judgment record was that the court ruled on. You mentioned that there were other matters filed, but- In template or in arcade? No, in this case, yeah. Well, I can see the fact that the denial of the motion to amend didn't get a lot of reasons. And then the court, I think that was your question. He had no reasons, he just denied it. But the point is, when the judge considered summary judgment, he had Mr. Grant's deposition, right? Yes, Your Honor. What else did he have before him? 40 exhibits. There was a lot of information, but Mr- About what? Well, the most important evidence, and what you'll see relied on the most by plaintiff on appeal, is Mr. Grant's late self-serving affidavit. Yeah, but see, that's what I'm just trying to, well, initially hone in, not what wasn't considered by the court. What was considered. We're trying to get- Our evidence. Thumbnail of what the quality or what the summary judgment looked like that the judge actually based the ruling on, so we have an appreciation for whether that was appropriate. Now, I get the point of the argument about other stuff, but just, so he had, the trial judge had Mr. Grant's deposition, what else? We had affidavits, and you're asking what we attached. We had affidavits- Yeah, just what the record- A lot. There were maybe 40 or 50, there were a lot of exhibits, a lot of attachments. We had affidavits from Mr. Grant's co-workers. There were nine depositions taken in this case. We had portions of transcripts from a lot of those depositions. We attached policies, we attached- But the nature of those was to show what? Not initially that he wasn't disabled or that it was accommodated or the misconduct. Well, that, and I can go through all of those elements. Well, I'm not trying to get you to do that, I'm just trying to get a firm grip on you move for you, your client's entitled to summary judgment as a matter of law, and it's that, that there's no material issue with the fact, and so I'm just, given that you conceded or acknowledged the disability, just trying to get a sense of what was the thrust of your summary judgment motion and the quality of evidence that the judge actually considered. Okay, going through the elements in what we provided. First of all, we showed that Mr. Grant was not otherwise qualified to hold this position. We attached evidence showing that he had falsified documents, all of the reasons why he was terminated, and there was extensive evidence of that. There was video showing him falsifying documents, there was testimony by a supervisor showing he had falsified observation logs. And to explain, Mr. Grant is a first responder, he was a juvenile supervision officer. He was required to supervise suicidal children. His job was to sit in a chair, look into a cell, and document every ten minutes at staggered intervals what a particular child was doing. He had a clock that he was to use, he had a log. He had acknowledged that he understood what to do. But what would happen is, he would pre-sign the log, and he would say that he had watched children before he actually had. And a supervisor would periodically come by, they would find that, and they would say, Mr. Grant, you don't have a time machine. You can't have looked at this child five minutes from now when the clock shows you haven't looked at it. So the supervisor would put a note, but then the supervisor would leave, and Mr. Grant would falsify, forge the supervisor's log to try and cover this up. That happened twice within a year. Mr. Grant was warned not to do that. He had also received a final warning because he just walked off the job and left children unsupervised for 20 minutes. How does a county have this many, quote, suicidal children in custody? I don't understand that. Is that from CPS or what? We're the third largest juvenile detention center in the United States. Well, what's the basis for detaining them? I assume- I mean, courts have ordered them, some have been convicted, some are awaiting trial. I mean, it's essentially a jail, just for juveniles. Well, that's my point. It's a detention, okay, it's a detention center for juveniles charged with crime, but you're saying the logs are kept to prevent suicide. Yes, Your Honor, and there have been suicides in the facility before. So in 2012, the center started more seriously, wanted to more seriously enforce these rules. So they put out new job descriptions based on Department of Labor exemplars for similar positions. They asked everyone to sign these job descriptions, they increased their training, and they started cracking down. In the first few years, there were 300 juvenile supervision officers terminated for violating these policies. There was no singling anyone out. What period of time was that? I believe this was three or four years, it's in the record, but within a short period of time. So there was no singling anybody out, the rules simply had to be enforced. So the first issue was that Mr. Grant was not otherwise qualified because of his workplace misconduct. You can imagine that if a child did commit suicide and he was asked to testify at trial and plaintiffs discovered that he had falsified his logs, he wouldn't be a credible witness for the department. He just couldn't be trusted with children anymore. The next reason why Mr. Grant was not, well, Mr. Grant gave a number of excuses and he claimed that his pen would malfunction and his pen made him alter his supervisor's log. That just wasn't a very credible excuse, or that he didn't know how to read the clock that he was supposed to be using. The second reason, well, so that was the first argument. The second thing that we said was that Mr. Grant never made a specific accommodation request. And while he has told us after final judgment, he signed a self-serving affidavit saying that he had previously been granted accommodations, there is nowhere else in the record, no one is aware of any accommodations he was given. There are no permanent sedentary positions for a first responder juvenile supervision officer. Under Texas law, they have certain requirements that they have to meet, certain physical standards they have to meet. So he didn't ask for a specific accommodation, and the first time was on December 20th, 2011, when he filed a complaint about a bunch of co-workers, a lot of long laundry list of complaints, and he mentioned a cryptic comment that his foot hurt. Now a lot of employers would take that and they would just ignore it. But what we did is we referred it to the county HR department, and then also Bianca Malvo, an assistant, followed up with Mr. Grant and said, Mr. Grant, I noticed that you put in here that your foot hurt, can we give you an accommodation? Mr. Grant testified at deposition that he told her, no, I don't need an accommodation. She said, please call me back if you change your mind. He never did. The second and third examples of where Mr. Grant may have requested an accommodation, we know that he was on FMLA and we granted him FMLA, there were no problems with that. Because his physician said that his once or twice a month, he would need to take a day off because of his diabetes. There was no problem with that. And we would follow up regularly with him, and he never said he needed an accommodation. He at one point had his physician write a letter saying that he needed 15 minute breaks. So when we got this letter, Mr. Grant didn't give it to the right employee, but it ended up in the hands of Dr. Matthew Shelton, who's high up in the department. Dr. Shelton wrote Mr. Grant, called Mr. Grant in and said, Mr. Grant, I got your letter. What can we do? You need 15 minute breaks? Mr. Grant said, I'm already getting the 15 minute breaks. And he testified at deposition he was always getting his breaks. What was very interesting is that Mr. Grant would secretly record these conversations from within a secure facility with his cell phone. And he produced some of these conversations to us. In one of those conversations, Mr. Grant's own tape caught Dr. Shelton asking him, what can we do to accommodate you? And Mr. Grant responded, he changed the topic, and he said, I want to write a school rap song. That was his answer. And so there were many attempts made, offered to accommodate Mr. Grant, and he wouldn't take it. So we went through every single one of the elements and showed how Mr. Grant couldn't meet any of the elements, except we do concede that diabetes is a disability, but it didn't affect his work in this case. Go on to the issue of harassment. There's no competent summary judgment evidence of harassment. Chief Judge, you asked in the last oral argument, you asked the key cases. And I would argue in this case, there are two key cases. The template case for the proposition of whether or not this evidence should even be considered on appeal, because the evidence was submitted after final judgment, if our worst case scenario for the county is that if this court looks and says, you know what, let's go ahead and just do a de novo review. And I'm very confident that if the court does do that and consider the evidence, it will still affirm summary judgment. So the second important case that I would refer the court to, if it does decide to do a de novo review, is Crater versus Louisiana. And the reason that's important is, every single issue that Mr. Grant has alleged, harassment, retaliation, discrimination, termination, were addressed by this court in 2017. So all the elements are there. Under Crater, Grant had to prove that harassment was so pervasive and abusive working environment. His claim cannot be evaluated based on his subjective physical and emotional responses to his workplace. They have to be evaluated based on the reactions of a reasonable, objective employee. Crater establishes that criticism is not harassment. Threats of termination is not harassment. Imposing reasonable work conditions is not harassment. Providing last chance agreements and final warnings is not harassment. I think it's very significant that we asked Mr. Grant in interrogatory, please identify the examples of harassment, retaliation, discrimination that you have. And I also want to point out that we asked in interrogatories for him to identify the accommodation request he made. So in response to interrogatory seven, Mr. Grant identified seven examples of alleged harassment. It wasn't until after final judgment was signed that he signed an affidavit where that balloon to 22 issues of incidents of harassment, it was a moving target. And I would argue that that shouldn't even be looked at. There are only five incidents of harassment of the original seven that were addressed on appeal. First, you heard opposing counsel mention that Mr. Grant was assigned to work on the fourth floor. Mr. Grant was assigned briefly in 2011 to work on the fourth floor when he complained about his previous assignment. And so they were working with him and trying to find a place. He complained about working on the fourth floor, so they reassigned him again. He was permitted, even with the labor shortages that the county had, he was given great latitude, and we tried to find a place to put him where he was happy. There's no evidence that the fourth floor was an inferior position, an inferior place. And besides, somebody had to guard the kids on the fourth floor. It was a part of his job description. And Mr. Grant, and this court has been very clear. Well, and then there's, second, there was an incident where Mr. Grant's supervisor took a picture of someone in the facility, you couldn't see the face, and posted it because that person was apparently sleeping on the job with his feet propped up. And posted it. Mr. Grant believed that was him, because Mr. Grant had his feet propped up on the job a lot and slept, and filed a complaint against his supervisor. Rather than the county even investigate Mr. Grant for sleeping on the job, they terminated his supervisor. Now that's pretty serious, a pretty serious effort to protect Mr. Grant. That if there's an allegation that someone has an unauthorized electronic device in the facility, and they're using it to take pictures, they're terminated. And Mr. Grant, we know after the fact, and we didn't know at the time, but we know now through discovery that he was constantly taking pictures and making recordings. So that wasn't harassment or retaliation for the department to take Mr. Grant's side and terminate a supervisor in response to Mr. Grant's complaint. This court has held in Stewart versus Mississippi Transportation Committee that if an employer takes quote, prompt remedial action, then the employer is protected from claims of harassment. That's as prompt, immediate, and serious as we could have done. Grant also claims it was harassment for Mr. Samuel to ask him to stop bothering his supervisor, to stop bothering a woman in the control booth, and get back to his assigned post. At deposition, Mr. Grant admitted he had no right to be in the control booth in the first place. That's not harassment. Grant also claimed it was harassment to ask him to sign his job description like everybody else in 2012. That's not harassment under Crater. Mr. Grant has claimed it was harassment because we asked him, if you need to go to the bathroom, just let somebody know, don't just walk off the job. And while you heard opposing counsel say that many times he had to urinate or threatened to urinate or defecate on himself, he didn't say any of that in deposition. He mentioned one time where it took a few minutes for him to get back up. That's it. It was, and he hasn't given any other specific dates, and all of this evidence came after final judgment. Those are the only incidents of harassment, retaliation, that were provided in discovery, and that were before the court, before final judgment was signed. The next issue is Mr. Grant's motion to leave, or to file a fourth amended complaint. Now, there were a couple of facts that had been a little bit misconstrued. In February 17th, 2006, Mr. Grant received his 90 day right to sue letter based on all of the incidences that he wanted to sue over. Mr. Grant filed a third amended complaint at the end of discovery, and said in that complaint, he promised, in pleadings, he would quote, add no new causes of action, and acknowledge that if he tried to add new claims, it would upset the scheduling order and require additional discovery. The day his summary judgment was due, Mr. Grant tried to amend the fourth time, and resurrect the abandoned claim, Title VII claim. Now, what's significant about this is, Mr. Grant has said that you analyze this under Rule 15, but that's not correct. This court has held that you analyze it under Rule 16, if it'll upset a scheduling order. And at first, you have to show good cause, and the Chief Judge correctly asked the question, what was the good cause? The court was just told that the good cause was that Mr. Grant had not received a right to sue letter on his Title VII claim. But if you look back through the record, what Mr. Grant's counsel actually represented to the court was that she believed she had the right to sue, but she inadvertently, through the first three amended complaints, forgot to file her lawsuit. Admitted that, and then a week- Is the Title VII right to sue letter in the record? It is, and here's what she found out, here's what was found out later, was that the DOJ had put the Roman numeral V and forgot the two Roman numeral I's. So Mr. Grant acknowledges he thought he had a right to sue and negligently forgot to sue, but then when later on discovered that typo, Mr. Grant said, aha, I've been waiting two years for this right to sue letter, but that's not true, and that's not what he believed. There's some case law- What's the date of the right to sue letter? It was February, let me find it real quick. February 17th, 2016. And that was how long before the other amendments were filed? There were amendments filed, he amended three times, file suit May 23rd, 2016, amended three times, and it was early 2018, oh, I'm sorry, it was in 2018 that he tried to amend the last time, early 2018. But it did have Roman numeral V, not a Roman numeral V. It was a typo. Did it mention retaliation? I don't recall, but it's in the record. The case that I would refer you to is the- Discrimination? I'm pretty sure it did, but don't quote me on it, I'd have to look at the record. But I would refer you to Hunter Reed versus City of Houston, which goes through the standards for being able. It says that he didn't even have to receive a letter. Once he had oral notice, any notice that he had a right to sue, he could proceed on that claim. There are rare circumstances when the statute of limitations will be told in circumstances like that. But in every single case, you have to show that you were diligent in trying to pursue your rights. And we have an admission on the record that Mr. Grant was not diligent for those two years. The typo is not excusable? I'm sorry? Typo is not excusable? I don't, when Mr. Grant acknowledges in the record that he thought he had the right to sue and he believed he had the right to sue, and then later discovers the typo, I don't think that's excusable, no, Your Honor. And I'm out of time, I can answer any questions the court has. All right, well, you covered the summary judgment, you covered the amendment, those were the main issues that were presented. The rest of it, I assume you've addressed in your brief, so. Yes, Your Honor. All right, thank you, sir. Thank you. Back to you, Ms. Blunt. There were several- One of the major assertions is that the county relies on their summary judgment and what the record showed at the pertinent time. And the assertion is that much of what you've put forward or put forward, traversing that occurred after the period of time it was submitted and therefore wasn't considered by the court and therefore shouldn't be considered by us. What's your best argument about that or your best case that would allow the other matters that you presented to be considered? The motion to amend the final judgment was based on the fact that the court had already denied the motion. So there was no reason for us to file another response. We took nine depositions. We engaged in several sets of discovery. There was no reason for me to intentionally miss a deadline that would be fatal to his case. We submitted at least 50 exhibits along with the response attached to the motion to amend. To show the court that we honestly believe, and I think any attorney in this position would have honestly believed that the motion for the motion to amend is based upon an error by the court. And as the court stated before, the denial- Let me ask you two different questions. One is the ADA claim and then secondly is the Title VII, right? Yes. All right, so first question was about the ADA claim and the summary judgment that was granted on the ADA claim. We've established that the disability is no longer in contest. Nonetheless, the city traverses everything else and says, here's all the evidence that was in there, it's deposition, etc. The district court was correct in grant summary judgment. And he says, what you provided to traverse that were other depositions or other matters that weren't properly tended within that time limit. And I was asking, what's your best case or law or argument that that other information you alluded to should have been considered by the district court or even us? Because the court used the same motion and exhibits to first deny it, saying that there were too many issues of fact. And then to use the same motion and order to grant it. And there was no additional evidence. Also, the whole argument or order in this case was really based on the disability, that Mr. Grant did not have a disability. Since that's been removed from the equation, the entire order and motion by the county is really moot. Because they've conceded, at least at this level, that the disability isn't the issue. That wipes out primarily all of the argument of their motion at the lower level and the court's order granting the summary judgment. Well, I do believe that the court found there was no disability. But if you look at the record that he cited, what he was citing was admissions by Mr. Grant that although he had diabetes, he could perform the functions of the job. So you can have a condition that is a disability, but it doesn't interfere with the performance of your job. And that's why I read a lot of that testimony. I understand, Judge. And the disability he had, diabetes type 2, manifested itself with his feet and walking. Before the accommodation, he was given sedentary positions. So his position really encompassed that. There are people at the Harris County Juvenile Detention Office that have these certain jobs they do every day as an accommodation. Mr. Grant was only requesting the same. He was not requesting more. And so, if you look at it, why would they revoke, after he engaged in protected activity, why would they revoke that accommodation? It had to be based upon retaliation and for his request for an accommodation. The county has argued that Mr. Grant said he wanted accommodation, but then he said he didn't. He alluded to it. That sounds like an issue of fact to me. And so, Mr. Grant specifically stated he wanted an accommodation. I believe the court, in reviewing the record, will see that there are many misstatements by the county that need to be addressed. And in the end, we believe that every request to reverse the lower court decision has been met. Thank you. All right, thank you, counsel, both sides, for your briefing and oral argument. This concludes the cases set for oral argument by this panel. And all the cases we've heard, in addition to those which were submitted as non-orally argued, will be submitted to the court for decision. And having said that, the court will stand adjourned.